FILED
2022 Jun-06  PM 03:52
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

RAPHAEL WARE,                           )
                                        )
          Plaintiff                     )
                                        )
vs.                                     )        Case No.  2:19-cv-01628-HNJ
                                        )
KAMTEK, INC.,                           )
                                        )
          Defendant                     )

## MEMORANDUM OPINION

This action proceeds before the court on Defendant Kamtek, Inc.'s Motion for Summary Judgment.  (Doc. 24).  Plaintiff Raphael Ware claims Kamtek discriminated against him on account of his gender and retaliated against him for engaging in protected activity, in violation of Title VII of the Civil Rights Act of 1964, *et seq.*, as amended.[1]

As discussed herein, Ware did not offer direct evidence of gender discrimination or retaliation, and he did not present sufficient circumstantial evidence of discrimination, either through the *McDonnell-Douglas* burden-shifting framework, or by

---

[1] Ware's Complaint also asserted claims for race discrimination pursuant to Title VII and 42 U.S.C. § 1981 (Doc. 1, at 3-4), and for retaliation pursuant to § 1981.  (*Id.* at 10-12).  However, Ware later conceded he did not have sufficient evidence to support his race discrimination claim, and he voluntarily dismissed that claim.  (Doc. 31, at 31).  In addition, because Ware does allege any retaliation for complaining about race-based discrimination, his § 1981 retaliation claim cannot succeed.  *See Batch v. Jefferson Cty. Child Dev. Council*, 183 F. App'x 861, 863 (11th Cir. 2006) ("Because § 1981 is a statutory remedy for claims of discrimination based on race or alienage only, its application to Batch's claim of retaliation is limited in that respect.").  Thus, only Ware's Title VII claims for gender discrimination and retaliation remain for consideration at summary judgment.

presenting a "convincing mosaic." Therefore, no reasonable juror could conclude that gender discrimination or retaliation motivated Kamtek's decision to terminate Ware's employment, and the court must grant Kamtek's motion for summary judgment.

## SUMMARY JUDGMENT STANDARD

Pursuant to the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11ᵗʰ Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

If the movant sustains its burden, a non-moving party demonstrates a genuine issue of material fact by producing evidence by which a reasonable fact-finder could return a verdict in its favor. *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11ᵗʰ Cir. 2007) (citation omitted). The non-movant sustains this burden by demonstrating "that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11ᵗʰ Cir. 1993). In the alternative, the non-movant may "come forward with additional

evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." *Id.* at 1116-17; *see also Doe v. Drummond Co.*, 782 F.3d 576, 603-04 (11th Cir. 2015), *cert. denied*, 136 S. Ct. 1168 (2016).

The "court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citations omitted). "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151 (citation omitted). "That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Id.* (citation omitted).

Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure

of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23.  In addition, a movant may prevail on summary judgment by submitting evidence "*negating* [an] opponent's claim," that is, by producing materials disproving an essential element of a non-movant's claim or defense.  *Id.* at 323 (emphasis in original).

There exists no issue for trial unless the nonmoving party submits evidence sufficient to merit a jury verdict in its favor; if the evidence is merely colorable or is not significantly probative, summary judgment may be granted.  *Anderson*, 477 U.S. at 249-50.  The movant merits summary judgment if the governing law on the claims or defenses commands one reasonable conclusion, *id.* at 250, but the court should deny summary judgment if reasonable jurors "could return a verdict for the nonmoving party."  *Id.* at 248.  That is, a court should preserve a case for trial if there exists "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Id.* at 249.

## SUMMARY OF FACTS

In July 2013, Plaintiff, Raphael Ware, a male, began working a permanent position as a Quality Auditor for Defendant, Kamtek, Inc., a Birmingham, Alabama, manufacturer of automotive body parts.  (Doc. 26-1, at 7; Doc. 26-3, ¶ 5).[2]  A Quality

---

[2] Prior to July 2013, Ware worked at Kamtek as a temporary employee through a temporary staffing agency.  (Doc. 26-1, at 8).

Auditor audits and inspects products before Kamtek ships them to its customers.  (Doc. 26-1, at 7-8).

The Quality Auditor position falls within Kamtek's Quality Department.  (*Id.*). Each Quality Auditor falls under the immediate supervision of a shift supervisor.  Joe Griffin served as Ware's direct supervisor at all relevant times.  Carlin Shade, the Area Leader, directly supervised Joe Griffin, and Bill Zinn, the Quality Manager, directly supervised Carlin Shade.  (*Id.* at 12; Doc. 26-4, ¶ 5; Doc. 26-4, at 7).   Only males comprised Ware's direct supervisory chain.

Kamtek adopted Plant Standards to "help make working conditions better and help everyone understand their work responsibilities."  (Doc. 26-1, at 46).  Kamtek reserved the right to impose "[d]isciplinary action, ranging from counselling to discharge, depending on the seriousness of the offense," for violations of plant rules, including:

1.   Falsifying any report or records, or giving false information with respect to personnel, absence, sickness, production, or falsely making injury claims.

2.   Repetitive or habitual absenteeism or lateness.

. . . .

9.   Interfering with others in the performance of their jobs or causing a restriction or slow-down of production.

. . . .

12.     Failing to give a satisfactory explanation of whereabouts or presence at unauthorized locations during the course of working hours.

. . . .

14.     Leaving the plant during working hours without permission or leaving one's department or work station during working hours without permission.

. . . .

21.     Failing to follow the call-in procedure to report an absence or lateness.

22.     Failing to be ready to work at the regular shift start time and following breaks.

(*Id.* at 46-47).   On July 27, 2013, Ware signed a form acknowledging he received training on the Plant Standards, agreed to follow the Plant Standards, and understood that his failure to abide by the Plant Standards could "lead to progressive discipline up to termination."  (*Id.* at 9-10, 47).

Kamtek's employee handbook included a Progressive Discipline policy with the following steps:  documented counseling; documented verbal warning; documented written warning(s); suspension; and discharge.   Kamtek "may skip steps in the progressive disciplinary process and can move directly to written warnings, suspensions and/or discharge without the need for prior disciplinary action."  (Doc. 26-3, at 151-52).   The handbook also states that "an employee who believes he or she has been discriminated against in any manner based upon his or her membership in a legally

6

protected class . . . should bring the matter to the attention of the Human Resources department or the Magna Employee hotline." (*Id.* at 151).[3]  Ware never received a copy of the employee handbook.  (Doc. 26-1, at 10; Doc. 26-6, at 64).

Kamtek permitted employees one thirty-minute lunch break and two other ten-minute breaks per shift.  An employee could leave the premises during a break, but Kamtek required the employee to clock out before doing so.  (Doc. 26-1, at 11-12).

Approximately once every week or two during his employment with Kamtek, Ware heard Shade, his second-level supervisor, comment about female employees disparagingly, like "fine ass, I want to F her, I'll pay her." (*Id.* at 14, 40).  Ware also saw Shade hug female employees, and Shade asked Ware to obtain telephone numbers from female employees so Shade could pursue romantic relationships with them.  (*Id.* at 40-41).

Sometime during April 2018, just after Ware reported for his shift, a female team leader asked him to locate a female employee named Shandetra Colvin[4] who she needed to perform a quality alert task.  Ware found Colvin "hanging around in the back somewhere doing nothing," though she was clocked in for work.  (*Id.* at 29-30, 39-40).

---

[3] Magna is Kamtek's parent company.  (Doc. 26-3, ¶ 6; Doc. 26-7, at 54).

[4] Ware suggested this employee's name was Deidre or Shondeidre, but the remainder of the record clarifies her correct name is Shandetra, or Detra.  (*See* Doc. 26-1, at 36-40; Doc. 26-6, at 67; Doc. 26-7, at 17-18; Doc. 26-8, at 14-16, 47; Doc. 29-1, at 13-17, 30-31, 38-39).  Ware's brief even refers to her as "Shonditra" or "Ditra."  (Doc. 31, at 6),

He told Colvin to report to the team leader, but Colvin stated she did not intend to do so, ostensibly because she was near the end of her shift.  (*Id.* at 30).

Ware reported Colvin's response to Shade, and Shade responded, "man I hate that, I wanted to F her."  (*Id.*).  Shade instructed Ware he should not have left his duty station to locate the female employee, despite the team leader's request.  (Doc. 26-1, at 30, 39).  Shade also rolled his eyes at Ware, a gesture Ware took to mean that Shade had placed a target on Ware's back.  (*Id.* at 29).[5]  As a result of this incident, Ware also met with Jennifer Bowers, the Human Resources Manager, who verbally counseled him to always work after clocking in, even if other employees occupied all the available computers.  (*Id.* at 30-31, 38-40).

Ware believed Shade's comments and disapproval of his actions constituted gender discrimination, as Shade also allowed special privileges for female employees with whom he wanted to pursue a sexual relationship.  Ware cited as an example Colvin, to whom Shade allegedly gave special assignments and only required her to work overtime when she really wanted it.  He also believed Shade had discriminated against him because Colvin did not receive any reprimand or other discipline for not working when she should have been, yet Ware received such discipline for not working.  (*Id.* at 28-29, 40).

---

[5] Shade denies this occurred, but the court must accept Ware's testimony as true for purposes of ruling on summary judgment.  (Doc. 26-8, at 44).

8

Ware complained to Griffin, his direct supervisor, who then involved Shade in the discussion. (*Id.* at 30).[6]   During his deposition, Ware did not recall the exact date of his complaint, but in his declaration, he stated he complained approximately three days before April 25, 2018. (*Id.* at 28; Doc. 29-5, ¶ 7). Ware did not share his complaint with any supervisor above Shade's level, with Human Resources, or with the parent company's employee hotline. (Doc. 26-1, at 29-30). Ware observed that Shade's behavior toward him changed after he complained about Shade. (*Id.* at 40).

On Saturday, April 21, 2018, Ware worked the first shift, which was 6:00 a.m. to 2:30 p.m. (*Id.* at 18). At 11:53 a.m., a female employee, Jasmine Parker, emailed Griffin to report Ware

> has been ignoring the calls for a Quality Auditor.  He's been back here several times on the dock just moseying around, but when they needed an Auditor he would not answer the radio.  I don't mind helping wherever I'm needed, but if he is not doing anything period (and there is not many lines running [*sic*]) then I don't understand what he is doing.  I just don't think it is fair.

(Doc. 26-5, at 7).

On April 23, 2018, Griffin received a statement from another female employee, Betty Mable, stating she observed Ware "walking around and talking" when he should have been working, and she added that Ware did not answer calls for a Quality Auditor.

---

[6] Griffin denies receiving these complaints, but the court must accept Ware's testimony as true for purposes of ruling on summary judgment. (Doc. 29-1, at 31).

(*Id.* at 9).

Griffin relayed Parker's and Mable's complaints to Shade, and he also shared his own concerns about Ware's whereabouts during the April 21, 2018, shift.  (*Id.* at 3, ¶ 7).  Shade relayed those concerns to Bowers, who commenced an investigation on either Monday, April 23, or Tuesday, April 24.  (Doc. 26-4, at 3, ¶ 7; Doc. 26-6, at 38-39).

When Kamtek receives a complaint regarding an employee's absence from the facility or a work station during a shift, it routinely examines records of the employee's badge scans at the facility's gates and other checkpoints.  (Doc. 26-7, at 16-17).  During 2018, an employee scanned his or her badge at a gate upon entering the premises from an outside road.  That scan allowed the employee access to the parking lot area.  The employee then scanned his or her badge again at a turnstile to enter the actual manufacturing building, and sometimes scanned the badge at a separate employee entrance.  (Doc. 26-1, at 12; Doc. 26-6, at 35-37, 109).

As part of her investigation into the complaints against Ware, Bowers generated a report of Ware's badge scan records for April 21, 2018, and for the two-month period preceding that date.  The badge scan records Kamtek produced in this litigation bear the date of April 25, 2018, but Bowers could not recall if she generated the report on April 23, 24, or 25.  Bowers generated a report containing a total of 432 pages of badge scan records during her investigation, but Kamtek produced only 108 pages to Ware in this litigation.  Bowers testified she only produced the pages she believed reflected

concerns with Ware's presence at the facility during work hours. (Doc. 26-6, at 30-35).[7]

The badge scan report for April 21, 2018, indicated Ware scanned his badge at the turnstile to leave the manufacturing building and enter the parking lot area at 7:47 a.m.  At 8:22 a.m., Ware scanned his badge at the gate for the entire Kamtek premises. A handwritten note on the badge scan report indicates that Ware "left" at 8:22 a.m., but the report itself does not specify whether the 8:22 scan represented an entry into or exit from the Kamtek premises.  Next, at 8:44 a.m., Ware scanned his badge at the turnstile to re-enter the manufacturing building.  At 8:45 a.m., he scanned his badge at another employee entrance door into the manufacturing building.  (Doc. 26-1, at 19-21, 24-25, 61; Doc. 26-2, at 62).  Kamtek interpreted those scans to depict Ware stood absent from his work station for a total of 57 minutes between 7:47 a.m. and 8:44 a.m., which exceeded the ten-minute allotment for morning and afternoon breaks, the 30-minute allotment for lunch, and the 50-minute total for all breaks Kamtek allowed in a day.

Ware acknowledged he left the premises to purchase a meal at Ken's BBQ restaurant during the morning hours of April 21, 2018, as the Kamtek cafeteria did not serve meals on Saturdays.  However, he denied his absence lasted 57 minutes.  (Doc. 26-1, at 25; Doc. 26-6, at 47).

Bowers reviewed Ware's time card records for April 21, 2018, and those records

---

[7] The court notes Ware did not file a motion to compel production of additional pages of the report.

revealed Ware did not clock out between 7:47 a.m. and 8:44 a.m.  (Doc. 26-3, ¶ 16). Failure to clock out when leaving the facility during a shift constituted a violation of company policy (*Id.* ¶ 17), but Ware denies he failed to clock out.  (Doc. 26-1, at 19, 25).

At 10:52 a.m. on April 21, 2018, Ware scanned his badge at the turnstile to leave the manufacturing building.  At 11:41 a.m., he scanned his badge at the turnstile to re-enter the manufacturing building, reflecting a total absence of 49 minutes, in excess of the 30-minute allotment for lunch and the 10-minute allotment for morning and afternoon breaks.  (*Id.* at 26; Doc. 26-2, at 63; Doc. 26-3, ¶ 18).  The record does not indicate whether Ware clocked out during that absence.

While reviewing Ware's badge scan records for the two-month period preceding April 21, 2018, Bowers discovered that on Saturday, March 24, 2018, during a shift that began at 6:00 a.m., Ware scanned his badge at the turnstile to exit the manufacturing building at 7:00 a.m., then scanned his badge at the turnstile to re-enter the building at 7:12 a.m., and he re-entered the employee entrance at the same time.  He scanned his badge at the turnstile to exit the manufacturing building at 8:00 a.m.  He scanned his badge at the entrance to Kamtek's premises at 8:30 a.m., and he scanned his badge at the turnstile to re-enter the manufacturing building at 8:33 a.m.  He scanned his badge at the turnstile to exit the manufacturing building at 9:05 a.m., and he scanned it again at the turnstile to re-enter the building at 9:14 a.m.  He then scanned his badge to re-

enter the employee entrance at 9:15 a.m.  He scanned his badge at the turnstile to exit the manufacturing building at 11:01 a.m., and he scanned it again at the turnstile to re-enter the building at 11:28 a.m.  He then scanned his badge to re-enter the employee entrance at 11:29 a.m.  (Doc. 26-2, at 15-19; Doc. 26-1, at 26-27).  Bowers interpreted that report to indicate Ware took four breaks during his March 24, 2018, shift (a 12-minute break from 7:00 a.m. to 7:12 a.m., a 33-minute break from 8:00 a.m. to 8:33 a.m., a ten-minute break from 9:05 a.m. to 9:15 a.m., and a 28-minute break from 11:01 a.m. to 11:29 a.m.).  (Doc. 26-3, ¶ 19).

Ware worked on Monday, April 23, 2018, and Tuesday, April 24, 2018, but neither Bowers nor anyone else from Human Resources or management questioned him about his badge scan history on those dates.  (Doc. 26-6, at 38; Doc. 26-9, at 103-10).  Bowers did not investigate whether other employees left the facility without clocking out, or whether other employees took excessively long breaks.  She also did not investigate whether other employees regularly left the premises for meals on Saturdays, when the Kamtek cafeteria did not offer service.  (Doc. 26-6, at 47).

The Kamtek property included multiple manufacturing buildings, including K1 and K2, where Ware worked.  (Doc. 26-8, at 40).  A walkable parking lot separated the K1 and K2 buildings.  (Doc. 26-6, at 3-4).  Typically, Quality employees rotated working one week in the K1 building and one week in the K2 building, but they occasionally needed to work in both buildings on the same day due to another Quality employee's

unanticipated absence.  (Doc. 26-8, at 40).  On such occasions, Ware sometimes drove his car between the two buildings and scanned his badge to enter each building.  He stated he worked in both buildings "[i]n April 2018," but he did not specifically state that he worked in both buildings on April 21, 2018.  (Doc. 29-5, ¶¶ 4-5).

On Wednesday, April 25, 2018, Ware again worked the 6:00 a.m. – 2:30 p.m. shift.  (Doc. 26-1, at 21).  At 10:35 a.m., a male employee, Centron "Ron" McCurdy, emailed Griffin and Shade to report he did not see a Quality Auditor on the K1 shipping dock between 8:00 a.m. and 8:25 a.m.  (Doc. 26-4, at 9).  That email did not mention Ware by name.  At 11:25 a.m., Griffin emailed Shade to report he received a call from McCurdy at approximately 8:25 a.m., complaining that he had not seen an auditor on the dock since 8:00 a.m.  Griffin identified the auditor working that shift as Ware, and he went to the dock to investigate, as an inspector's absence could delay delivery drivers' departures.  Ware did not reappear until 8:43 a.m.  (*Id.* at 11).  During his deposition, Ware denied he took a 43-minute break the morning of April 25, and he alleged McCurdy lied.  (Doc. 26-1, at 21-22).  According to Bowers, Ware absented the premises between 8:24 a.m. and 8:39 a.m., and he did not clock out.  (Doc. 26-3, ¶ 19).

Sometime on April 25, 2018, Bowers shared the results of her investigation with Shade.  (*Id.* ¶ 22; Doc. 26-4, ¶ 10).  Shade recommended to Bowers that Kamtek should terminate Ware's employment, but the record contains conflicting information regarding the timing of that recommendation.   Shade attested he made the

14

recommendation after he and Bowers met with Ware at the end of Ware's shift. (Doc. 26-4, ¶ 14).  During Shade's deposition, he first testified he recommended termination after meeting with Ware, and he "more than likely" made that recommendation before Bowers did.  (Doc. 26-8, at 22-23).  But he later testified he and Bowers did not talk about Ware again after their April 25 meeting with Ware, and Bowers knew before the meeting commenced that he recommended termination.  That testimony indicates Shade made the recommendation prior to the meeting with Ware.  (*Id.* at 24).

Bowers also discussed the situation with Charman Meador before meeting with Ware.  (Doc. 26-6, at 56).  Meador served as the Human Resources Manager at the Kamtek facility until October 2017, but after that date she received a promotion to Director of Human Resources for Kamtek's parent company.  In that role, she supports the Human Resources groups at various facilities by mentoring Human Resources Managers like Bowers and providing advice on handling various employee problems. (Doc. 26-7, at 8-9, 15-16, 41).  Meador encouraged Bowers to examine Ware's badge scan records, and if she discovered he left work for an excessive amount of time without clocking out, "it's theft of time, and we terminate that."  In that regard, Meador testified, "I was part of [the termination decision] and agree and support the decision."  (*Id.* at 16).

At the end of Ware's shift that day, Bowers and Shade called Ware into Bowers's office.  (Doc. 26-1, at 22; Doc. 26-3, ¶ 23; Doc. 26-6, at 31, 33).  They asked Ware if he

left the premises on April 21.  Ware acknowledged he left the premises to go to Ken's BBQ, but he denied staying away for as long as the badge scans depicted.  (Doc. 26-1, at 24-25).[8]  Shade and Bowers told Ware he stayed away too long during his break, without clocking out, and Bowers said his absence constituted a theft of the company's time.  (*Id.* at 25, 27; Doc. 26-3, ¶ 25).  Neither Shade nor Bowers questioned Ware about any other occurrences of unaccounted time, or about any other problems, during the April 25, 2018, meeting.  (Doc. 26-6, at 50).  Bowers asked Ware to turn over his badge, and she told him she would follow up with him within one to two weeks.  She did not inform Ware that Kamtek suspended or terminated his employment.  (Doc. 26-1, at 27; Doc. 26-3, ¶ 25).  Ware did not complain during this meeting that he suffered any kind of discrimination.  (Doc. 26-1, at 27-28).

At 4:44 p.m. on April 25, 2018, Bowers sent an email to several supervisory, information technology, and security employees, stating Ware "has been terminated effective April 25, 2018."  (Doc. 26-9, at 234).  Bowers confirmed during her deposition that April 25, 2018, constituted the effective date for Ware's termination.  (Doc. 26-6, at 33).  However, the record remains unclear whether Ware underwent a brief period of suspension prior to the final termination.  Despite sending the email on April 25,

---

[8] Bowers claims Ware initially denied leaving the Kamtek premises on April 21, 2018, but after Bowers showed him the badge scan reports, he admitted he went to Ken's BBQ.  (Doc. 26-3, ¶ 24).  However, Ware denied lying to Bowers about his whereabouts, and the court must accept Ware's testimony as true for purposes of ruling on the motion for summary judgment.  (Doc. 26-1, at 22-23).

2018, announcing Ware's termination, Bowers testified Kamtek did not terminate Ware's employment the same day it sent him home.  She explained that when Kamtek initiates "these suspensions pending investigation, if it is found . . . that we're going to terminate, then the effective date is the date of the suspension that we sent the person home."  (*Id.*).  No separate documentation exists confirming the suspension, "because it's not a progressive discipline step . . . [s]o it wouldn't be documented in that way." (*Id.*).

Bowers explained the reasons for the termination decision as follows:

Based on my review of the aforementioned [badge scan] records (which indicated Mr. Ware stole company time on multiple occasions), Mr. Ware's admission that he stole company time, and a telephone conversation I had with Charman Meador explaining the findings of my investigation, I (along with Ms. Meador) made the decision to terminate Mr. Ware's employment (with input from Mr. Shade).  This decision had nothing whatsoever to do with any of Mr. Ware's protected characteristics (including, but not limited to, his race and gender) or any complaint he allegedly made.

(Doc. 26-3, ¶ 27).  She characterized Ware's on-the-clock absences on April 21, 2018, as the "key incident" leading to his termination."  (Doc. 26-6, at 50).  The record does not clearly specify when Kamtek provided Ware notice of the termination decision.   In a response to Plaintiff's Interrogatories, Kamtek stated that Meador made the termination decision, with input from Bowers and Shade.  (Doc. 29-6, at 15-16).

Prior to his termination, Ware never received any discipline for taking excessively long breaks or failing to clock out during a break. (Doc. 26-6, at 39).  Griffin, Ware's

immediate supervisor, never noticed or reported any problems with the length of Ware's breaks.  Griffin regularly reviewed reports of employees' clock-in and clock-out times to verify payroll, and he never discerned that Ware clocked out excessively.  (Doc. 29-1, at 17, 29-30, 33).  Griffin did not receive advance notice of Ware's termination, and no one consulted him about the termination decision.  (*Id.* at 15).

Kamtek replaced Ware with a female employee on June 18, 2018.  (Doc. 29-6, at 16).

On March 10, 2015, Camilla Hill, a female Quality Department forklift driver who worked under a different supervisory chain of command than Ware, received a three-day suspension for using her cell phone for several minutes while sitting on a forklift on the plant floor.  The suspension notice stated Hill's superiors had repeatedly informed her not to use her cell phone on the plant floor.  It also stated her past progressive discipline history demonstrated her inability to adhere to basic policy standards, as she had received the following previous disciplinary actions:   (1) a December 2013 Step 3 Written Warning for failure to return from breaks on time; (2) an April 2014 Step 3 Written Warning for parking in a designated accessible space; and (3) an October 2014 Step 3 Written Warning for parking in a designated accessible space.   The March 10, 2015, suspension represented Step 4 of the progressive

disciplinary policy.  (Doc. 29-11, at 2; *see* Doc. 26-3, ¶ 35; Doc. 26-8, at 48).[9]

A Record of Corrective Action addressing the December 2013 incident reflects Hill received a Written Warning "for failing to be ready to work at regular shift times following breaks (Plant Standard #22) and lateness (Plant Standard #2).  A repeat incident will result in future disciplinary actions up to termination."  (Doc. 29-16, at 2).  The document does not provide details regarding the extent of Hill's lateness, but Ware testified Hill returned to work two hours late.  (Doc. 26-1, at 32).[10]

The record also contains badge scan records for Hill.  On Thursday, September 17, 2015, Hill scanned her badge to leave the K2 building gate at 10:39 a.m., and she scanned it again to enter the same gate at 11:04 a.m., representing an absence of 25 minutes.  On Saturday, September 19, 2015, Hill scanned her badge to exit the K2 gate at 7:40 a.m., and she scanned it again to enter the K2 gate at 8:19 a.m., representing an absence of 39 minutes.  On the same day, she scanned her badge to exit the K2 gate at 11:03 a.m., and she scanned it again to enter the K2 gate at 11:18 a.m., representing an absence of 15 minutes.  On Saturday, September 26, 2015, Hill scanned her badge to exit the K2 gate at 10:26 a.m., and she scanned it again to enter the K2 gate at 11:11 a.m., representing an absence of 45 minutes.  On Friday, October 2, 2015, Hill scanned

---

[9] A Record of Corrective Action form in Hill's personnel file states she received a suspension, not a written warning, for parking in a designated accessible space.  (Doc. 29-14).

[10] Ware refers to the female employee as Shade's cousin as he did not remember her name.  Shade testified Camilla Hill is his cousin.  (Doc. 26-8, at 48).

her badge to exit the K2 gate at 10:46 a.m., and she scanned it again to enter the K2 gate at 11:23 a.m., representing an absence of 37 minutes.  On Sunday, October 4, 2015, Hill scanned her badge to exit the K2 gate at 8:52 a.m., and she scanned it again to enter the K2 gate at 9:33 a.m., representing an absence of 41 minutes.  On Tuesday, October 6, 2015, Hill scanned her badge to exit the K2 gate at 10:36 a.m., and she scanned it again to enter the K1 employee entrance at 11:26 p.m., representing an absence of 50 minutes.  (Doc. 29-12, at 2-9).  On March 23, 2015, Hill received an overall rating of "average – meets job standards" on her performance review.  (Doc. 29-13, at 4).

Ware also presents evidence that a female Kamtek Quality Auditor, Tabitha Yelverton, filed an EEOC charge on December 22, 2014, alleging that Shade sexually harassed her by inappropriately touching and propositioning her, and Kamtek fired her in retaliation after she complained of Shade's harassment.  (Doc. 29-7, at 12-13).  On August 30, 2016, Yelverton filed a complaint against Kamtek in this court, alleging claims for sexual harassment, retaliation, assault and battery, invasion of privacy, and outrage.  (*Id.* at 1-8; Doc. 1 in Case No. 2:16-cv-01431-JHE).  On October 18, 2016, the court dismissed that complaint pursuant to Yelverton's Notice of Dismissal.  (Doc. 9 in Case No. 2:16-cv-01431-JHE).

Ware filed an EEOC charge on July 12, 2018 (Doc. 1, at 15-16), and he filed this case on October 3, 2019.  (*Id.* at 1).

In November 2019, Shade received a promotion to Assistant Quality Manager

over the Castings Department in the K-3 building.  That position did not work out, and in March 2020, Kamtek transitioned Shade to the position of World Class Manufacturing Coordinator, which restored him to the lower pay level he occupied prior to the November 2019 promotion.  In that position, which Shade continued to hold as of his June 23, 2021, deposition, he prepares weekly reports for management on key performance indicators, and he does not supervise any other employees.  (Doc. 26-8, at 5-7).

In October 2020, some Kamtek employees organized an employee walkout in protest of racially offensive photos of a noose in the workplace.  (*Id.* at 29; Doc. 29-9).

On approximately October 20, 2020, Kamtek awarded Shade the position of Diversity, Equity, and Inclusion Officer for the entire Kamtek operation of more than 1,100 employees.  Shade did not receive any compensation for that position, and he retained his World Class Manufacturing Coordinator position.  As Diversity, Equity, and Inclusion Officer, Shade facilitates focus group discussions, documents the results of the discussions, and relays the results to the management team to develop improvement strategies.  Prior to accepting that position, Shade never performed any human resources duties.  Kamtek did not post the Diversity, Equity, and Inclusion Officer position before awarding it to Shade.  (Doc. 26-8, at 20-21).

## DISCUSSION

As stated previously, Ware does not present direct evidence of either gender

21

discrimination or retaliation.  He contends circumstantial evidence establishes a *prima facie* case of gender discrimination via the *McDonnell-Douglas* burden-shifting framework. However, he cannot demonstrate Kamtek's proffered legitimate, non-discriminatory reasons for terminating his employment constituted a mere pretext for gender discrimination, and he does not present a convincing mosaic of circumstantial evidence evincing gender discrimination either.

Ware also does not present sufficient circumstantial evidence of retaliation, either through the *McDonnell-Douglas* standard's *prima facie* framework, or via a convincing mosaic of circumstantial evidence.  Even if he could present a *prima facie* case of retaliation, he cannot demonstrate Kamtek's proffered legitimate, non-retaliatory reasons for terminating his employment constituted a mere pretext for retaliation.

Therefore, neither Ware's gender discrimination claim nor his retaliation claim can survive summary judgment.

## I.  Ware Can Establish a *Prima Facie* Case of Gender Discrimination, but He Cannot Demonstrate Pretext, and He Does Not Present a Convincing Mosaic of Gender Discrimination

Under Title VII, a covered employer may not "discharge any individual, or otherwise . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ."  42 U.S.C. § 2000e-2(a)(1).  Because Ware does not claim to possess direct evidence of Kamtek's alleged gender discrimination, the court will assess whether he presents

sufficient circumstantial evidence to withstand summary judgment.

As discussed, Ware can establish a *prima facie* case of gender discrimination pursuant to the *McDonnell-Douglas* burden-shifting framework, but he cannot establish Kamtek's legitimate, non-discriminatory reasons for terminating his employment constituted a mere pretext for gender discrimination.   He also cannot portray a convincing mosaic of evidence to support his gender discrimination claim.

**A.     Ware Can Establish a *Prima Facie* Case of Gender Discrimination Pursuant to the *McDonnell-Douglas* Burden-Shifting Framework, But He Cannot Establish Pretext**

The court first examines Ware's gender discrimination claim pursuant to the *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), burden-shifting framework.  Under that framework, Ware bears the initial burden of establishing a *prima facie* case of discrimination.  If he does so, the burden shifts to Kamtek to articulate a legitimate, non-discriminatory reason for terminating Ware's employment.  If Kamtek satisfies that burden, the burden shifts back to Ware to demonstrate Kamtek's proffered reason constituted a mere pretext for unlawful discrimination.  *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1220-21 (11th Cir. 2019) (citing *McDonnell Douglas*, 411 U.S. at 802; *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 256 (1981)).

**1.     Ware Can Establish a *Prima Facie* Case of Gender Discrimination**

Ware can establish a *prima facie* case of gender discrimination by demonstrating

23

> (1) that he is a member of a protected [gender] class, (2) that he was qualified for the position, (3) that he experienced an adverse employment action, and (4) that he was replaced by someone outside of his protected class or received less favorable treatment than a similarly situated person outside of his protected class.

*Flowers v. Troup Cty., Ga., Sch. Dist.*, 803 F.3d 1327, 1336 (11th Cir. 2015) (citing *Maynard v. Bd. of Regents,* 342 F.3d 1281, 1289 (11th Cir. 2003); *McDonnell Douglas Corp.,* 411 U.S. at 802); *see also Cobb v. Floyd,* No. 21-10535, 2022 WL 856074, at *1 (11th Cir. Mar. 23, 2022) (quoting *Maynard,* 342 F.3d at 1286) (a plaintiff may "[a]lternatively . . . establish the fourth prong [of a *prima facie* case of discrimination] by showing [he] 'was replaced by a person outside [his] protected class.'"); *Cuddeback v. Fla. Bd. of Educ.*, 381 F.3d 1230, 1235 (11th Cir. 2004) (applying the "alternative" formulation of the fourth element of a *prima facie* case for a gender discrimination claim).

Kamtek does not dispute the first three elements.  (Doc. 25, at 20).  Indeed, as a male alleging discrimination based upon gender, Ware belongs to a protected class.  The court can infer Ware's qualification for his position from the fact he held the job for almost five years.  *Liebman v. Metro. Life Ins. Co.*, 808 F.3d 1294, 1299 (11th Cir. 2015) (quoting *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1360 (11th Cir. 1999)) ("'[I]f a plaintiff has enjoyed a long tenure at a certain position, we can infer that he or she is qualified to hold that particular position.'"); *see also Schrock v. Publix Super Markets, Inc.*, 653 F. App'x 662, 664 (11th Cir. 2016) (applying *Liebman* in the context of a gender discrimination claim); *Damon,* 196 F.3d at 1360 (courts should not consider a plaintiff's

poor job performance during the *prima facie* stage of the *McDonnell-Douglas* analysis). And the termination of Ware's employment clearly constituted an adverse employment action. *See Munoz v. Selig Enterprises, Inc.*, 981 F.3d 1265, 1276 (11th Cir. 2020) (citing *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1234-35 (11th Cir. 2010)) ("Ms. Munoz suffered an adverse employment action because Selig terminated her.").

Kamtek disputes the final element, which it phrases as requiring proof that "similarly situated . . . female employees . . . received more favorable treatment than [Ware] did after committing the same misconduct." (Doc. 25, at 20). However, as discussed, Ware may also satisfy the fourth element of his *prima facie* case by demonstrating that Kamtek replaced him with a female employee, and he has produced such evidence.

Kamtek argues the Eleventh Circuit's decision in *Lewis v. City of Union City, Georgia*, 918 F.3d 1213 (11th Cir. 2019), nullifies the alternative formulation of the *prima facie* case with its statement that "a meaningful comparator analysis must be conducted at the *prima facie* stage of *McDonnell Douglas*'s burden-shifting framework, and should not be 'move[d]' to the pretext stage." *Id.* at 1218 (alteration in original). But *Lewis* addressed only whether the comparator analysis belongs in the *prima facie* case stage or the pretext stage vis-à-vis the framework at issue therein; it did not address the alternative formulation of the *prima facie* element applicable at bar, which deems evidence the employer replaced plaintiff with a person outside the protected class as

satisfying the inquiry.  The Eleventh Circuit has not applied the alternative *prima facie* case in a published opinion after *Lewis,* but it has consistently recited it in unpublished opinions, strongly indicating that either formulation of the *prima facie* case remains available to plaintiffs pursuing discrimination claims.  *See, e.g, Cobb,* 2022 WL 856074, at *1; *Moreland-Richardson v. City of Snellville, Georgia*, No. 19-14228, 2021 WL 4452523, at *5 (11th Cir. Sept. 29, 2021); *Ward v. Troup Cty. Sch. Dist.*, 856 F. App'x 225, 228 (11th Cir. 2021); *Barneman v. Int'l Longshoreman Ass'n Loc. 1423*, 840 F. App'x 468, 479 (11th Cir. 2021); *Cooper v. Georgia Dep't of Transportation*, 837 F. App'x 657, 667 (11th Cir. 2020); *Herron-Williams v. Alabama State Univ.,* 805 F. App'x 622, 628 (11th Cir. 2020).

> ### 2.  Kamtek Proffered a Legitimate, Non-Discriminatory Reason for Terminating Ware's Employment, and Ware Cannot Demonstrate Pretext

As Ware satisfied his burden of establishing a *prima facie* case of gender discrimination, the burden shifts to Kamtek to articulate a legitimate, non-discriminatory reason for the employment decision.  Kamtek asserts it terminated Ware's employment because of his theft of company time on April 21, 2018, and on the other dates Bowers discovered during her investigation of the April 21 incident, as their investigation portrays Ware did not clock out when he took those excessive breaks. (Doc. 25, at 31).  Kamtek thus articulated a legitimate, non-discriminatory reason for the termination decision, and the burden shifts back to Ware to demonstrate Kamtek's proffered reason constituted a mere pretext for unlawful discrimination.  *See Lewis*, 918

F.3d at 1220-21.

Ware shoulders that burden by "'cast[ing] doubt on [Kamtek's] proffered nondiscriminatory reasons sufficient to allow a reasonable factfinder to determine that [they] were not what actually motivated [Kamtek's] conduct.'" *Smelter v. S. Home Care Servs. Inc.*, 904 F.3d 1276, 1290 (11th Cir. 2018) (quoting *Silvera v. Orange Cty. Sch. Bd.*, 244 F.3d 1253, 1258 (11th Cir. 2001)) (first and third alterations in original, second and fourth alterations added). He must also produce evidence "'that discrimination was the real reason'" for his termination. *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1312 (11th Cir. 2018) (citing *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007)). He

> must rebut the [employer's proffered] reason "head on" and "cannot succeed by simply quarreling with the wisdom of that reason." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (*en banc*); *see also Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308 (11th Cir. 2007) (explaining that, where more than one legitimate reason is given, the plaintiff must rebut each one). At the summary judgment stage, "[t]he district court must evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Jackson v. State of Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (alteration in original) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)).

*Hornsby-Culpepper*, 906 F.3d at 1312 (second alteration in original).

Ware asserts that when Shade and Bowers met with him on April 25, 2018, they did not mention any incidents other than his April 21, 2018, on-the-clock absences, and

their subsequent reliance on additional incidents casts aspersion on their explanation. The Eleventh Circuit has held that "shifting reasons" for an employment decision may allow the jury to find the employer's explanation "unworthy of credence, and consequently to infer the real reason was [discrimination]." *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1195 (11th Cir. 2004).

> Nonetheless, additional, but undisclosed, reasons for an employer's decision do not demonstrate pretext. *See Tidwell v. Carter Prod.,* 135 F.3d 1422, 1428 (11th Cir. 1998). Thus, we have concluded that the plaintiff failed to show pretext where, although the employer offered differing explanations for its decision, its reasons were not necessarily inconsistent. *See Zaben v. Air Prod. & Chemicals, Inc.,* 129 F.3d 1453, 1458-59 (11th Cir. 1997).

*Landolfi v. City of Melbourne, Fla.*, 515 F. App'x 832, 835 (11th Cir. 2013).

To the extent Kamtek offered differing explanations for terminating Ware's employment (the April 21 absences alone vs. the April 21 absences plus other incidents of allegedly stealing time), those explanations do not present inconsistencies. Rather, Kamek proffered additional explanations garnered at the time of the discharge that it did not mention to Ware during the April 25 meeting. That does not support a finding of pretext, particularly when the April 21 absences, standing alone, could warrant termination pursuant to Kamtek's policies.

Moreover, Ware cannot demonstrate pretext without casting doubt upon *each* of Kamtek's proffered reasons. *See Smelter*, 904 F.3d at 1290-91 (citing *Crawford*, 482 F.3d at 1308) ("Because a plaintiff's failure to rebut even one nondiscriminatory reason is

sufficient to warrant summary judgment for the employer, we need not address Smelter's remaining pretext arguments."). Therefore, even if Ware could show that other absences or other incidents did not actually play a part in the termination decision, he still would need to refute Kamtek's assertion that the April 21 absences warranted his termination.

Ware also points out that Bowers generated a report containing a total of 432 pages of badge scan records during her internal investigation, but Kamtek produced only 108 pages to Ware in this litigation. However, the mere fact the production exhibited missing pages does not portray a deficiency in the investigation that mars the results. Bowers testified she printed and produced only the pages she believed reflected issues with Ware's presence at the facility during work hours. Even if the other pages she did not produce all reflected Ware properly clocked out for breaks, that evidence would not diminish the consequences of Ware's failure to clock out on April 21, as those alleged failures, standing alone, supported Ware's discharge pursuant to Kamtek policy.

Ware asserts Griffin, his immediate supervisor, never noticed or reported problems with Ware's breaks or clock-out practices, and the decisionmakers did not consult Griffin before deciding to terminate Ware. But, as discussed in the previous paragraph, Ware's failure to clock out during the excessive breaks he took on April 21, 2018, suffices to support his termination. Griffin does not dispute Ware failed to clock

out for those breaks, so even if he testified Ware appropriately clocked out for breaks on other days, such testimony would not call into question the motivation behind the termination decision.   In fact, in addition to relaying other employees' complaints, Griffin reported his own concerns about Ware's whereabouts on April 21.

Ware also denies taking excessive breaks and failing to clock out when he left the premises during his breaks on April 21 and other dates, but his denial does not suffice to demonstrate pretext.  As the Eleventh Circuit maintains:

> Importantly, "we must respect that an 'employer [need not] have good cause for its decisions.'" *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924 (11th Cir. 2018).  Instead, an employer "may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for [an unlawful] reason." *Id.*  In other words, we need not "determine that the employer was correct in its assessment of the employee's performance; [we] need only determine that the defendant in good faith *believed* plaintiff's performance to be unsatisfactory" because then the asserted reason could not be "mere pretext for discrimination." *Moore v. Sears, Roebuck & Co.*, 683 F.2d 1321, 1323 n.4 (11th Cir. 1982) (emphasis added).

*Forsyth v. Univ. of Alabama, Bd. of Trustees*, No. 20-12513, 2021 WL 4075728, at *5 (11th Cir. Sept. 8, 2021) (*per curiam*) (alterations and emphasis in original); *Lee v. Safe-Dry Carpet & Upholstery*, No. 20-14275, 2021 WL 3829028, at *3 (11th Cir. Aug. 27, 2021) (*per curiam*) ("The legitimate, nondiscriminatory reason offered by an employer for an action need not be one a judge or juror would act on or approve." (citing *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1269 (11th Cir. 1999))).

Rather than evaluating the truth of the allegations against Ware, the court must

30

assess "'whether unlawful discriminatory animus motivate[d]'" the decision to terminate his employment. *Todd v. Fayette Cty. Sch. Dist.*, 998 F.3d 1203, 1218 (11th Cir. 2021) (quoting *Damon*, 196 F.3d at 1361). "As a result, the pretext inquiry 'centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head.'" *Todd,* 998 F.3d at 1218 (citing *Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010); *Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318, 1329 (11th Cir. 2020)); *see also Elrod v. Sears, Roebuck & Co.,* 939 F.2d 1466, 1470 (11th Cir. 1991) ("We can assume for purposes of this opinion that the complaining employees . . . were lying through their teeth.").

The central question remains whether Kamtek was "dissatisfied with [Ware] for non-discriminatory reasons, 'even if mistakenly or unfairly so, or instead merely used those complaints about [Ware] as cover for discriminating against [him] . . . .'" *Chambers v. Fla. Dep't of Transp.*, 620 F. App'x 872, 878 (11th Cir. 2015) (*per curiam*) (quoting *Alvarez,* 610 F.3d at 1266). "Whether [Kamtek] accurately assessed [Ware's] job performance is not our inquiry, and 'we must be careful not to allow . . . plaintiffs simply to litigate whether they are, in fact, good employees.'" *Id.* (quoting *Rojas v. Florida,* 285 F.3d 1339, 1342 (11th Cir. 2002)); *see also Tibbs v. Admin. Off. of the Illinois Cts.*, 860 F.3d 502, 506, 507 (7th Cir. 2017) ("Pretext 'involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action.' . . . Merely disagreeing with an employer's reasons does not meet this standard.

31

A plaintiff must point to 'evidence tending to prove that the employer's proffered reasons are factually baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate' the termination. . . . [H]e needs to point to facts showing that [the proffered] explanation is unworthy of belief." (citations omitted)).

Thus, Ware cannot merely assert, without any evidence, the badge scan and time clock reports contained errors. He must point to evidence Kamtek did not rely on those reports in good faith.[11] Based on the lack of evidence the badge scans and time clock reports contained errors, Ware does not raise a triable issue regarding whether Kamtek's decisionmakers acted in good faith in reliance upon its records.

Ware asserts he sometimes worked in both the K1 and K2 manufacturing buildings on the same day, and he scanned his badge at the gate to each building when he travelled between them. Those scans could give the erroneous appearance of an employee unjustifiably leaving his work station when in reality he was commuting between two work stations. But Ware did not provide any evidence that he worked in both manufacturing buildings on April 21, 2018, or on any other date for which Kamtek questioned his badge scans. To the contrary, he acknowledged he left the Kamtek premises to purchase a meal at Ken's BBQ on April 21. The April 21 badge scan report

---

[11] The same reasoning applies to Ware's assertion during his deposition that he did not understand the badge scan reports. (Doc. 26-1, at 27). Kamtek's good faith reliance on the reports, not Ware's understanding of them, constitutes the material factor.

indicates Ware left a manufacturing building at 7:47 a.m. but did not re-enter a manufacturing building until 8:44 a.m.  *See Forsyth v. Univ. of Alabama, Bd. of Trustees*, No. 20-12513, 2021 WL 4075728, at *6 (11th Cir. Sept. 8, 2021) (considering other information confirming decisionmakers' good faith belief that the plaintiff had taken unauthorized breaks).  Those records do not identify which building Ware exited and which building he entered, but even if he did travel between the two buildings, no reasonable juror would believe it took him 57 minutes to do so, as only the length of a parking lot separated the two buildings.  Accordingly, Ware's assertions about traveling between manufacturing buildings do not undermine Kamtek's proffered legitimate reason for terminating his employment.

Ware also raises questions about whether he underwent a brief period of suspension pending investigation on April 25, 2018.  If he did experience a suspension, it lasted only a matter of hours, as Kamtek identifies the effective date of Ware's termination as April 25. Presumably, Ware raises this point to support an assertion that Kamtek did not conduct a sufficiently thorough investigation before deciding to terminate his employment.  (Doc. 31, at 11) ("[T]here was no investigation other than gate scans . . . .").  Ware also criticizes Kamtek for not investigating whether other employees left the facility without clocking out on Saturdays, when the facility's cafeteria did not serve lunch, and for failing to acknowledge that most other employees did not clock out for beaks.  (Doc. 31, at 24, ¶¶ 77-78).

But Ware does not produce any evidence that a lengthier investigation would have unearthed exculpatory details; that Kamtek had received complaints about any other employees taking excessive breaks on Saturdays, thereby warranting a review of their badge scans; or that the employees who did not clock out for allotted break times had an obligation to do so.  Indeed, as to the latter point, Ware would have been fine if that were the policy, but the evidence indicates he took <u>excessive</u> breaks without clocking out.

Even more significantly, as discussed more fully in the following paragraph, Ware offers no evidence of a pattern of female employees receiving more favorable treatment. Without any such evidence, Ware merely quarrels with the wisdom of Kamtek's decision, without confronting the decision "head on" or linking it to a discriminatory motive.

Ware asserts Kamtek's more favorable treatment of female employees who took excessive breaks undermines the stated legitimate reason for his termination.[12]  To give rise to an inference of discrimination, "a plaintiff proceeding under *McDonnell*

---

[12] The Eleventh Circuit held in *Lewis v. City of Union City, Georgia*, 918 F.3d 1213 (11ᵗʰ Cir. 2019), that courts should assess comparator evidence as part of the plaintiff's *prima facie* case of discrimination, not *only* during the pretext analysis.  *Id.* at 1224.  As alluded previously, the *Lewis* prescription arises in the context where a comparator analysis forms a part of the *McDonnell-Douglas prima facie* elements, unlike the circumstances here.  Indeed, the Court clarified that "[e]vidence necessary and proper to support a plaintiff's *prima facie* case may of course be used, later as it were, to demonstrate that the defendant's explanation for its conduct was pretextual."  *Id.* at 1223 n.9.  Thus, even after *Lewis*, the court can consider evidence regarding similarly situated comparators at the pretext stage.

*Douglas* must show that []he and h[is] comparators are 'similarly situated in all material respects.'" *Lewis*, 918 F.3d at 1226.  Generally, a similarly situated comparator:  (1) "will have engaged in the same basic conduct (or misconduct) as the plaintiff"; (2) "will have been subject to the same employment policy, guideline, or rule as the plaintiff"; (3) "will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff"; and (4) "will share the plaintiff's employment or disciplinary history." *Lewis*, 918 F.3d at 1227-28.

Ware identifies two potential comparators:  Camilla Hill and Shandetra Colvin. Prior to his termination, Ware complained that Colvin did not receive any reprimand or counseling for standing around not working, while he received a verbal reprimand for leaving his work station to locate Colvin.  However, Kamtek did not discharge Ware for leaving his work station to locate Colvin; it discharged him for taking excessive breaks without clocking out, which Kamtek undisputedly discovered after the incident involving Ware allegedly discovering Colvin was not working.  The sole, alleged instance of Colvin not working as her shift neared its end does not constitute the same misconduct as failing to clock out while taking excessive breaks, which Kamtek found Ware perpetrated.  Therefore, Colvin does not constitute a proper comparator.

Hill received a December 2013 written warning (as opposed to a termination) for lateness and failing to timely return from breaks, and Ware testified she returned to work two hours late.  First, Ware has presented no evidence Hill failed to clock out on

35

the occasion warranting the December 2013 warning.  There ensues an appreciable difference between returning late from a break, and failing to clock out when taking excessive breaks.  Furthermore, Hill was not similarly situated to Ware in all material respects.  Though both worked within the Quality Department, Hill worked as forklift driver, not a Quality Auditor, like Ware.  Most significantly, Hill worked under different supervisors than Ware.  Shade, the supervisor who allegedly treated females more favorably due to his sexual desires, did not fall in Hill's chain of command.

To be sure, Hill's badge scan records reveal she took excessively long breaks on September 17, 2015 (25 minutes), September 19, 2015 (39 minutes and 15 minutes), September 26, 2015 (45 minutes), October 2, 2015 (37 minutes), October 4, 2015 (41 minutes), and October 6, 2015 (50 minutes).  However, the record does not indicate whether Kamtek generated those badge scan reports for this litigation, or pursuant to an investigation before this litigation ensued.  In addition, the record does not reflect whether Hill's breaks occurred while she was on the clock, or whether the breaks were excused in any way.[13]

---

[13] Kamtek likely sustained no reason to generate the reports until requested to do so during this litigation.  Kamtek maintained a practice of running a badge scan report when an employee experienced an attendance or timeliness problem, as Hill did when she arrived to work two hours late. But the two-hour tardiness occurred in 2013, and the other discrepancies in the badge scan report hail from 2015.  The record contains no evidence of any additional reason for Kamtek to run a badge scan report for Hill in 2015.

Though the Eleventh Circuit has stated that a comparator does not invariably need to fall under the same supervisor as a plaintiff, *Lewis*, 918 F.3d at 1227-28, Eleventh Circuit and district court cases, even after *Lewis,* situate a common supervisor as an important factor. *See Robinson v. Walmart Stores E., LP,* No. 21-10560, 2021 WL 5881756, at *2 (11th Cir. Dec. 13, 2021) ("Martin was not an adequate comparator because he held a different position with different responsibilities, and he also had a different supervisor . . . ."); *Gibson v. JetBlue Airways Corp.*, No. 20-10943, 2021 WL 5368056, at *6 (11th Cir. Nov. 18, 2021) ("Perhaps most importantly, [the alleged comparators] did not share the same supervisor [as the plaintiff]."); *Nealy v. SunTrust Bank*, No. 21-11358, 2021 WL 5112819, at *2 (11th Cir. Nov. 3, 2021) ("Nealy's comparators worked in different departments under different supervisors with different rules."); *Brown v. Synovus Fin. Corp.*, 783 F. App'x 923, 930 n.8 (11th Cir. 2019) ("None of Brown's colleagues constitute comparators because they occupied different positions, had different certifications, or worked for different supervisors than Brown."); *Wood v. City of Warner Robins, Georgia*, No. 5:19-CV-00319-TES, 2022 WL 987991, at *24 (M.D. Ga. Mar. 31, 2022) ("Sure, Haslem's misconduct may have been the same as Plaintiff's, but he can't be properly considered a comparator for the simple fact that his supervisor wasn't Chief Moulton."). As Ware's theory of discrimination centers upon Shade affording favorable treatment to females with whom he wanted to pursue a sexual relationship, favorable treatment of females outside Shade's supervisory

purview does not undermine Kamtek's proffered legitimate reason for terminating Ware's employment.

In summary, Ware has failed to offer sufficient evidence for a reasonable juror to disbelieve Kamtek's proffered legitimate reason for terminating his employment, or for a reasonable juror to believe that gender discrimination constituted the real reason for the termination decision. Accordingly, though he established a *prima facie* case of gender discrimination pursuant to the *McDonnell-Douglas* framework, his gender discrimination claim cannot survive Kamtek's motion for summary judgment.

### B.     Ware Does Not Present a Convincing Mosaic of Gender Discrimination

Even though Ware cannot prove gender discrimination via the *McDonnell-Douglas* burden-shifting framework, his claim may survive summary judgment if he "'presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" *Jenkins v. Nell*, 26 F.4th 1243, 1250 (11th Cir. 2022) (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)). Ware may form that mosaic with "evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) 'systematically better treatment of similarly situated employees,' and (3) pretext." *Id.*

As stated previously, Ware has not offered evidence of pretext or systematically

38

better treatment of similarly situated female employees. *See Tsavaris v. Savannah L. Sch., LLC*, 847 F. App'x 634, 642 (11th Cir. 2021) ("For the most part, Tsavaris relies on the same evidence to establish a mosaic as she does to show pretext. Those arguments fail under [the "convincing mosaic" standard] for the same reasons they fail under *McDonnell Douglas*.").[14]  He also points to other circumstantial evidence, including Shade's alleged sexual harassment of Tabitha Yelverton; Shade's inappropriate sexual comments to Ware about female employees, including that he wanted to "F" Colvin; Shade's generally preferential treatment of female employees; Kamtek's decision to appoint Shade the Diversity, Equity, and Inclusion officer after it received "complaints that he sexually harassed Yelverton, discriminated against Ware, made sexually offensive comments about female employees, talked about wanting to have sex with female employees, and both Yelverton and Ware complained that he retaliated against them by firing them just days after their protected activity"; and the presence of racially offensive photos that prompted an employee walkout.  (Doc. 31, at 32).

The circumstances taken as a whole do not weave together in a mosaic that would convince a reasonable juror Kamtek intentionally discriminated against Ware, particularly as a reflection of systemic discrimination against male employees.  None of

---

[14] This assessment encompasses Ware's assertion that his replacement by a female comprises part of the convincing mosaic of gender discrimination.  That fact supported Ware's *prima facie* case of discrimination under the *McDonnell-Douglas* framework, but Ware could not demonstrate that Kamtek's legitimate, non-discriminatory reasons for the termination constituted pretext.

the additional circumstantial evidence proffered by Ware appreciably indicates preferential treatment against Kamtek's male employees. When the Eleventh Circuit has found a convincing mosaic of discrimination, the plaintiff presented far more evidence of discriminatory intent than what exists here.

For example, in *Jenkins v. Nell,* 26 F.4th 1243 (11th Cir. 2022), the Court depicted the following mosaic:

> (1) Jones [a black employee] committed a Rule A-6 violation (like Jenkins [the white plaintiff]) but remained employed; (2) no less than 18 white crane operators retired, resigned, or transferred from the department since Nell [the allegedly discriminating black supervisor] took over; (3) evidence that Nell mistreated three white crane operators; (4) Nell's [allegedly favorable] relationship with HR; (5) Nell's racially-biased comments about white crane operators; (6) Jenkins declining to change his accident report about a hard landing; and (7) Nell's shifting reasons for terminating Jenkins.

*Id.* at 1250-51.

In *Lewis, supra,* the Eleventh Circuit found a convincing mosaic of race and gender discrimination when the employer arbitrarily applied its policies; the record contained ample evidence of pretext; employees outside the plaintiff's protected class received better treatment (though they did not strictly qualify as similarly situated comparators); and the decisionmaking supervisor rendered negative comments about women. *Id.* at 1185-88.

In *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321 (11th Cir. 2011), the Eleventh Circuit found a convincing mosaic of race discrimination when a race-motivated

shooting in the workplace incentivized the employer to discipline white employees more harshly than black employees, the record contained evidence of pretext, and the employer tracked the race of employees involved in disciplinary decisions. *Id.* at 1341-47.

Absent any showing of pretext, the circumstances in this case do not rise to the level presented in those cases. There exists no evidence Shade discriminated against other male employees or commented negatively about them. A reasonable juror would not conclude Ware presented circumstantial evidence of discrimination against men in the Kamtek workplace.

## II.   Ware Cannot Establish a *Prima Facie* Case of Retaliation, Pretext, or a Convincing Mosaic of Retaliatory Intent

Title VII's anti-retaliation provision provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. §2000e-3(a). Ware does not offer direct evidence of retaliation; thus, as with his gender discrimination claim, he may survive summary judgment by presenting circumstantial evidence of retaliatory intent, either through the *McDonnell-Douglas* framework or by demonstrating a convincing mosaic of retaliation.

As stated previously, Ware cannot establish a *prima facie* case of retaliation, but

even if he could, he could not establish Kamtek's legitimate, non-retaliatory reasons for terminating his employment constituted a mere pretext for retaliation.  He also cannot demonstrate a convincing mosaic of evidence to support his retaliation claim.

A.   **Ware Cannot Establish a *Prima Facie* case of Retaliation Pursuant to the *McDonnell-Douglas* Burden-Shifting Framework, Nor Can He Establish Pretext**

To press a *prima facie* retaliation claim pursuant to Title VII, Ware must demonstrate (1) he engaged in statutorily protected activity; (2) he suffered a materially adverse action; and (3) some causal relation exists between the two events. *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)).

To satisfy the first element of the *prima facie* case, Title VII "recognizes two forms of statutorily protected conduct." *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1350 (11th Cir. 1999).  "An employee is protected from discrimination if (1) 'he has opposed any practice made an unlawful employment practice by [§ 2000e]' (the opposition clause) or (2) 'he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [§ 2000e]' (the participation clause)."  *Id.* (quoting 42 U.S.C. § 2000e-3(a)).

Ware proceeds under the opposition clause, as he challenges allegedly retaliatory conduct stemming from his complaints about Shade's perceived discrimination. Demonstrating those complaints constituted protected activity does not require Ware

42

"to show that the employer actually engaged in an unlawful employment practice." *Berman v. Orkin Exterminating Co.*, 160 F.3d 697, 702 (11th Cir. 1998); *accord Tipton v. Canadian Imperial Bank of Com.*, 872 F.2d 1491, 1494 (11th Cir. 1989) ("The employee need not prove the underlying claim of discrimination which led to her [complaint]"). Rather, Ware must demonstrate he possessed "'a good faith, reasonable belief that the employer was engaged in unlawful employment practices' and the employer took adverse action against [him] for opposing the practices." *Munoz*, 981 F.3d at 1280 (quoting *Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1213 (11th Cir. 2008)).  To do so, he "must present evidence that [he] subjectively believed [his] employer was engaged in unlawful practices, and that [his] belief was objectively reasonable in light of the facts and record presented." *Id.* (citing *Butler*, 536 F.3d at 1213; *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1284 (11th Cir. 1999)).

Ware complained that Shade did not reprimand female employees for leaving their duty stations, and he gave them preferable assignments.  This evidence may establish Ware subjectively perceived Shade discriminated against him on the basis of gender when Shade instructed him not to leave his duty station and allegedly doled out privileged assignments to female employees.  However, Kamtek asserts Ware's perception of discrimination was not objectively reasonable, as Ware's complaint did not identify any adverse employment action he suffered at Shade's hands, and an actionable discrimination claim must include proof of an adverse employment action.

*See Flowers*, 803 F.3d at 1336 (reciting the elements of a *prima facie* case of gender discrimination); *Howard v. Walgreen Co.*, 605 F.3d 1239, 1244 (11th Cir. 2010) (quoting *Clover*, 176 F.3d at 1351) (reasonableness of an employee's belief that the employer "engaged in an unlawful employment practice must be measured against existing substantive law").

As an initial matter, "[w]here binding precedent squarely holds that particular conduct is not an unlawful employment practice by the employer, and no decision of [the Eleventh Circuit] or of the Supreme Court has called that precedent into question or undermined its reasoning, an employee's contrary belief that the practice is unlawful is unreasonable." *Butler*, 536 F.3d at 1214 (citing *Harper v. Blockbuster Entm't Corp.,* 139 F.3d 1385, 1388-39 (11th Cir.1998); *Weeks v. Harden Mfg. Corp.,* 291 F.3d 1307, 1317 (11th Cir. 2002)).  A plaintiff "may not stand on [his] ignorance of the substantive law to argue that [his] belief was reasonable," because "'[i]f the plaintiffs are free to disclaim knowledge of the substantive law, the reasonableness inquiry becomes no more than speculation regarding their subjective knowledge.'" *Weeks*, 291 F.3d at 1317 (citing *Harper,* 139 F.3d at 1388 n. 2; *Little v. United Techs., Carrier Transicold Div.,* 103 F.3d 956, 960 (11th Cir. 1997)).

Therefore, Ware must demonstrate an objectively reasonable belief Shade subjected him to an adverse employment action that warranted his complaints of discrimination.

> Not all employer actions that negatively impact an employee qualify as "adverse employment actions." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1238 (11th Cir. 2001)[, *overruled on other grounds by Burlington*, 548 U.S. 53]. Rather, only those employment actions that result in "a *serious and material* change in the terms, conditions, or privileges of employment" will suffice. *Id.* at 1239 (emphasis in original).   "Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Id.*

*Howard*, 605 F.3d at 1245 (emphasis in original).  Shade's comment to Ware about leaving his duty station and his alleged grant of preferable work and overtime assignments to females fall short of that standard.

Regarding Shade's critical comment, the Eleventh Circuit has held that "[e]mployer criticism, like employer praise, is an ordinary and appropriate feature of the workplace," and it expressed concerns that "[e]xpanding the scope of Title VII to permit discrimination lawsuits predicated only on unwelcome day-to-day critiques and assertedly unjustified negative evaluations would threaten the flow of communication between employees and supervisors and limit an employer's ability to maintain and improve job performance."  *Davis*, 245 F.3d at 1242.  "Simply put, the loss of prestige or self-esteem felt by an employee who receives what he believes to be unwarranted job criticism or performance review will rarely — without more — establish the adverse action necessary to pursue a claim under Title VII's anti-discrimination clause." *Id.*

Illustrating these principles, the Eleventh Circuit held in *Howard*, *supra*, that a supervisor's telephone message informing the plaintiff his job was in jeopardy fell "well

short of an adverse action," as the plaintiff's employment status did not change, and he did not suffer any other tangible consequences.  605 F.3d at 1245.

In *Akins v. Fulton Cty., Ga.,* 420 F.3d 1293 (11th Cir. 2005), the Eleventh Circuit found "unwarranted reprimands, a negative work evaluation, threat of job loss through dissolution of the contracting division, threat of suspension without pay, exclusion from meetings, [and] removal of job duties (followed by reprimands for not completing that work)" did not constitute adverse employment actions, either singly or in the aggregate, as they did not materially affect the plaintiff's compensation or job status.  *Id.* at 1301.

In *Cheatham v. DeKalb Cty., Georgia*, 682 F. App'x 881 (11th Cir. 2017), the Eleventh Circuit panel held two written counseling documents did not constitute adverse employment actions, as they did not lead to "tangible job consequences."  *Id.* at 889-90.

Following suit, district courts within the Eleventh Circuit have held that negative comments on a performance evaluation, *Butler v. Emory Univ.*, No. 1:13-CV-151-TCB-LTW, 2014 WL 12798688, at *17 (N.D. Ga. Aug. 15, 2014), *report and recommendation adopted*, 45 F. Supp. 3d 1374 (N.D. Ga. 2014), verbal and written counselings and reprimands, *White v. City of Sylvester*, No. 1:14-CV-00076 (LJA), 2016 WL 1270236, at *11 (M.D. Ga. Mar. 31, 2016), and disciplinary notices, *James v. Home Depot U.S.A., Inc.,* No. 114CV01502WSDJFK, 2015 WL 13736593, at *6 (N.D. Ga. Nov. 10, 2015), *report and recommendation adopted*, No. 1:14-CV-1502-WSD, 2016 WL 2770528 (N.D. Ga. May

13, 2016), did not constitute adverse employment actions.

Based upon that authority, Shade's comment to Ware did not constitute an adverse employment action, as it represented only normal employer criticism and did not result in any tangible consequences for Shade's employment or compensation.[15] Therefore, Ware's complaint that Shade discriminated against him vis-à-vis the instruction to not leave his work station cannot serve as the basis for a retaliation claim.

Regarding Shade's alleged grant of preferable assignments to female employees, the Eleventh Circuit has instructed:

> Work assignment claims strike at the very heart of an employer's business judgment and expertise because they challenge an employer's ability to allocate its assets in response to shifting and competing market priorities. . . . .
>
> For these reasons, applying the adverse action requirement carefully is especially important when the plaintiff's claim is predicated on his disagreement with his employer's reassignment of job tasks. Courts elsewhere have been reluctant to hold that changes in job duties amount to adverse employment action when unaccompanied by any tangible harm. *See, e.g., Mungin v. Katten Muchin & Zavis,* 116 F.3d 1549, 1557 (D.C. Cir. 1997) (agreeing with "other circuits [which] have held that changes in assignments or work-related duties do not ordinarily constitute adverse employment decisions if unaccompanied by a decrease in salary or work

---

[15] That Kamtek ultimately terminated Ware's employment plays no part in this portion of the analysis; rather, the *prima facie* element at issue concerns whether Ware engaged in statutorily protected conduct by opposing an objectively ascertainable, unlawful employment practice. For this portion of the analysis, the court applies the standard for assessing adverse employment actions in intentional discrimination claims, not the more permissive standard for adverse actions in retaliation claims. Rather than evaluating whether an employment action had a tangible effect on the terms and conditions of employment, that standard considers whether the employment action "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 57 (2006).

hour changes.") (citing, inter alia, *Kocsis v. Multi-Care Mgmt.,* 97 F.3d 876, 886-87 (6th Cir. 1996) and *Crady*[v. *Liberty Nat. Bank and Trust Co. of Indiana,* 993 F.2d 132, 136 (7th Cir. 1993)].

*Davis*, 245 F.3d at 1244-45 (first alteration in original).

Thus, "a change in work assignments" can elicit a Title VII discrimination claim, but only if it is "so substantial and material that it does indeed alter the 'terms, conditions, or privileges' of employment." *Davis,* 245 F.3d at 1245 (citing *McNely v. Ocala Star-Banner Corp.,* 99 F.3d 1068, 1077-78 (11th Cir. 1996)).

In the vast majority of instances, . . . an employee alleging a loss of prestige on account of a change in work assignments, without any tangible harm, will be outside the protection afforded by Congress in Title VII's anti-discrimination clause – especially where . . . the work assignment at issue is only by definition temporary and does not affect the employee's permanent job title or classification.

*Davis*, 245 F.3d at 1245.

In *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232 (11th Cir. 2001), the Eleventh Circuit held that removing the plaintiff from an "Officer-in-Charge" position did not constitute an adverse employment action, regardless of whether the Court viewed the removal as a demotion or a change in work assignments, as the position was temporary and did not "affect the employee's permanent job title or classification." *Id.* at 1243, 1245.

In *Kidd v. Mando Am. Corp.*, 731 F.3d 1196 (11th Cir. 2013), the Court held that a demotion claim "grounded on a loss of supervisory responsibility . . ., not a loss of

salary or benefits," did not rise to the level of a materially adverse action "as viewed by a reasonable person in the circumstances." *Id.* at 1204 (quoting *Davis*, 245 F.3d at 1244).

In *Shannon v. Bellsouth Telecommunications, Inc.*, 292 F.3d 712 (11th Cir. 2002), the Court found the plaintiff's reassignment to a work area where he claimed he experienced more difficulty meeting the company's performance standards did not constitute an adverse employment action. *Id.* at 716.[16]

Ware testified only that female employees received "special" assignments. He did not provide any evidence that his own assignments negatively affected his job title, classification, compensation, or benefits. Accordingly, binding, unquestioned precedent dictates that Ware did not complain of an adverse employment action when he addressed females receiving better work assignments. He could have had no

---

[16] The court notes *Shannon* involved a retaliation claim, not a discrimination claim, yet *Shannon* applied the "tangible harm" standard to assess whether the plaintiff suffered an adverse employment action. That discrepancy results because Eleventh Circuit rendered *Shannon* before the Supreme Court clarified in *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 57 (2006), that courts should apply a more permissive standard to retaliation claims. As *Shannon* applied the same standard the Eleventh Circuit now uses to evaluate adverse employment actions in discrimination claims, it is instructive.

Moreover, though binding precedent must dictate whether an employee formed an objectively reasonable belief that he complained of unlawful discrimination, the Eleventh Circuit has also issued non-published (and, therefore, non-binding) opinions indicating Ware's complaint of unfavorable job assignments did not trigger Title VII's anti-retaliation provisions. In *Mitchell v. Univ. of N. Alabama*, 785 F. App'x 730 (11th Cir. 2019), the Court held the plaintiff's assignment to a new position did not constitute an adverse employment action when it did not reduce her pay or benefits. *Id.* at 736. In *Edwards v. Ambient Healthcare of Georgia, Inc.*, 674 F. App'x 926 (11th Cir. 2017), the Court held the plaintiff did not suffer an adverse employment action under the more expansive retaliation standard when the employer made her existing job duties more difficult but did not cut her pay or take away her title. *Id.* at 930. In *Jackson v. Hall Cty. Gov't*, 518 F. App'x 771 (11th Cir. 2013), the Court held the plaintiff's shift assignments did not constitute an adverse employment action when those assignments did not result in a "material effect" on his employment. *Id.* at 773.

49

objectively reasonable belief that Kamtek engaged in an unlawful activity based upon his work assignments.

Although not argued in his brief, Ware complained that Shade accorded a female employee, Colvin, the option to decline overtime work unless she desired it. Ware's contention presents an uncommon theory. The Eleventh Circuit has held that a *denial* of overtime can constitute an adverse employment action if it "'deprived [the employee] of compensation which he otherwise would have earned.'" *Shannon*, 292 F.3d at 716 (quoting *Bass v. Bd. of County Comm'rs*, 256 F.3d 1095, 1118 (11th Cir. 2001), *overruled in part on other grounds by Crawford v. Carroll*, 529 F.3d 961 (11th Cir. 2008)) (alteration in original). But Ware did not complain that Kamtek denied him overtime; he complained that Shade did not require Colvin to work overtime when she did not want to.

Some courts have cognized such a claim. *See, e.g., Mondzelewski v. Pathmark Stores, Inc.*, 162 F.3d 778, 788 (3rd Cir. 1998) (holding that "[a]ssigning an employee to an undesirable schedule can be more than a 'trivial' or minor change in the employee's working conditions"); *Prioli v. Cty. of Ocean*, No. 218CV00256BRMESK, 2021 WL 4473159, at *5 (D.N.J. Sept. 30, 2021) (stating "mandatory overtime can be an adverse employment action"); *Norris v. Washington Metro. Area Transit Auth.*, 342 F. Supp. 3d 97, 112-13 (D.D.C. 2018) (citing *Bell v. Gonzales*, 398 F. Supp. 2d 78, 97 (D.D.C. 2005); *Dickerson v. SecTek, Inc.*, 238 F. Supp. 2d 66, 76-77 & n. 5 (D.D.C. 2002)) ("'working overtime . . . is not universally regarded as desirable[,]' and imposition of overtime work

on an employee has been found to be an adverse action in some cases." (ellipsis and alteration in original)).

However, the majority of decisions contemplating this issue have ruled that requiring overtime work does not constitute an adverse employment action. *See, e.g., Matsko v. New York*, No. 518CV00857MADTWD, 2022 WL 137724, at *10 & n.9 (N.D.N.Y. Jan. 14, 2022) (finding that requiring the plaintiff to work overtime when the company had no other employees to cover shifts did not constitute an adverse employment action); *Brown v. DeJoy*, No. 3:19-CV-615-DJH-CHL, 2021 WL 5530955, at *6 (W.D. Ky. Nov. 24, 2021) (ruling that intentionally requiring the plaintiff to work overtime for three days did not constitute a materially adverse action, even under the more expansive standard for assessing adverse employment actions in retaliation claims); *Tipler v. Douglas Cty., Nebraska*, No. 8:04CV470, 2006 WL 1314328, at *13-14 (D. Neb. May 11, 2006), *aff'd sub nom. Tipler v. Douglas Cty., Neb.*, 482 F.3d 1023 (8th Cir. 2007) (holding that required overtime resulting from a new shift assignment did not constitute an adverse employment action because the plaintiff already had to work regular overtime as part of her regular duties); *Jackson v. DeJoy*, No. CV 19-12403(4), 2021 WL 5367268, at *11-12 (E.D. La. Nov. 17, 2021) (holding that the plaintiff did not suffer an adverse employment action when her employer required her to work longer hours than other employees); *Blake v. Wells Fargo Bank, N.A.*, No. 1:18CV790, 2020 WL 406358, at *10 (M.D. N.C. Jan. 24, 2020), *aff'd*, 819 F. App'x 183 (4th Cir.

2020) (finding that requiring the plaintiff to work overtime did not constitute an adverse employment action because the plaintiff "was paid to work overtime, which benefitted her"); *Godwin v. Potter*, No. 3:04-00606, 2007 WL 9782880, *6 (M.D. Tenn. Jan. 12, 2007) (holding that the plaintiff "did not suffer a materially adverse employment action when she was required to work overtime on October 30, 2003 (an action to which she initially agreed)"); *Moore v. Henderson*, 174 F. Supp. 2d 767, 776 (N.D. Ill. 2001) ("Denial of overtime has a tangible economic effect, and thus normally constitutes an adverse action. . . . But Moore does not complain that the postal service denied her overtime opportunities; she complains the postal service provided her with too many. Moore worked the same amount of overtime as every temporary employee not excused from the requirement. Working overtime did not cause Moore to lose her job; was not a demotion; did not negatively impact her pay; did not alter her benefits; and did not change her title. The postal service compensated Moore for overtime at time and a half her normal rate of pay, the same as all temporary employees. Moore offers no explanation how working overtime constitutes an adverse action."); *Swinson v. Tweco Prod., Inc.*, No. 89-1531-K, 1992 WL 190686, *10 (D. Kan. July 17, 1992), *aff'd*, 9 F.3d 118 (10th Cir. 1993) (holding the plaintiff did not experience an adverse employment action, even under the more expansive retaliation standard, when her employer required her to work more overtime hours than she desired because the plaintiff did not have to work more hours than other employees in her position.").

The court need not weigh in on either side of the afore-described dichotomy. Even if Ware's theory is viable, the evidence does not establish he opposed an unlawful employment action in these circumstances.  As the testimony portrays, Colvin, the female employee referenced by Ware, performed overtime work unless she did not desire it.  This vague reference reveals that Colvin actually worked overtime unless she had a reason not to, which does not objectively depict a discriminatory employment practice vis-à-vis Ware's circumstances.  Ware did not provide any detailed information about how much overtime he worked compared to female employees; he did not identify any specific instances when Kamtek required him to work overtime after he expressed a preference not to do so; he did not demonstrate Kamtek only required him to work overtime after Shade became interested in sexual relationships with female employees; and he did not state Kamtek failed to properly compensate him for overtime work.

Moreover, even if Ware could establish a *prima facie* case of retaliation, he could not demonstrate Kamtek's proffered reason for terminating his employment (excessive breaks without clocking out on April 21, 2018, and other dates) was a mere pretext for retaliatory motive.  The close temporal proximity between his complaint and termination does not demonstrate pretext standing alone, s*ee Gogel v. Kia Motors Mfg. of Georgia, Inc.*, 967 F.3d 1121, 1138 n.15 (11th Cir. 2020), and as discussed in the context of Ware's gender discrimination claim, he has failed to call into question the veracity of

Kamtek's stated reason. Ware also failed to offer any evidence that retaliation constituted the true reason for the termination decision, whether in the form of a generally retaliatory work environment, similarly situated, non-complaining comparators who did not lose their jobs after taking excessive breaks without clocking out, or any other means.

Based on the above, Ware cannot sustain his retaliation claim through the *McDonnell-Douglas* burden-shifting framework.

### B. Ware Does Not Present a Convincing Mosaic of Retaliation

The Eleventh Circuit has not yet decided whether the "convincing mosaic" standard applies to retaliation claims. *Bailey v. Metro Ambulance Servs., Inc.*, 992 F.3d 1265, 1273 n.1 (11th Cir. 2021). However, even if the standard does apply, Ware has not presented evidence of a convincing mosaic of retaliatory motive. He has offered no evidence of suspicious timing, ambiguous statements, systematically better treatment of non-complaining employees, or pretext. Simply stated, the record contains no evidence of retaliation other than that discussed in connection with Ware's *prima facie* case, which did not suffice to sustain his burden under the *McDonnell-Douglas* framework. Accordingly, Ware cannot survive summary judgment on his retaliation claim by presenting circumstantial evidence of retaliatory intent.

### CONCLUSION

As discussed above, Ware did not offer direct evidence of gender discrimination

or retaliation, and he also has not presented sufficient circumstantial evidence, either through the *McDonnell-Douglas* burden-shifting framework, or through the "convincing mosaic" standard.  No reasonable juror could conclude that gender discrimination or retaliation motivated Kamtek's decision to terminate Ware's employment.  Therefore, the court must grant Kamtek's motion for summary judgment on both claims.  The court will enter a separate order and final judgment.

      **DONE** this 6th day of June, 2022.

HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE